# EXHIBIT 1

Ricoh v. Nashua Corporation          CV-94-163-M    09/30/98
                    UNITED STATES DISTRICT COURT

                      DISTRICT OF NEW HAMPSHIRE


Ricoh Electronics;
Ricoh Corporation; and
Ricoh Company, LTD,
      Plaintiffs

      v.                                      Civil No. 94-163-M

Nashua Corporation,
      Defendant


                            **O R D E R**


      In its memorandum decision on liability, the court reserved

judgment on damages pending the appointment of a court expert

(Fed. R. Evid. 706) and the taking of additional testimony

relative to the adequacy, from an accounting perspective, of the

financial documents, exhibits, and testimony provided by Ricoh to

support a reliable incremental cost determination; the de minimus

or substantial nature of any incremental costs that might have

been omitted in Ricoh's lost profits calculation; what Ricoh's

hypothetical incremental costs would likely have been; and other

relevant opinions.  In appointing an expert, the court recognized

its own inadequate understanding of potentially relevant

accounting principles and, hence, some lingering doubt as to the

adequacy of the proof to support a lost profits award.  The court

expert has since been appointed, provided a report, been

subjected to discovery depositions by both parties, and has

testified and been cross-examined by both parties.  In addition,
the parties have filed supplemental legal memoranda on the issue
of damages.

## Lost Profits

Liability for infringement having previously been determined
by the court, plaintiff is entitled to an award of damages
"adequate to compensate for [that] infringement."  35 U.S.C. §
284.  As the Supreme Court discussed in Aro Manufacturing Co. v.
Convertible Top Replacement Co., 377 U.S. 476 (1964):

> The question to be asked in determining damages is "how
> much had the Patent Holder and Licensee suffered by the
> infringement.  And that question [is] primarily:  Had
> the Infringer not infringed, what would Patent Holder -
> Licensee have made?"  Livesay Window Co. v. Livesay
> Industries, Inc., 251 F.2d 469, 471 (5th Cir. 1958).

Id., at 507.

Where the patentee, Ricoh in this case, is itself producing
the patented item, the general rule is that actual damages are to
be determined based upon lost sales and profits to the patentee
because of the infringement.  Del Mar Avionics, Inc. v. Quinton
Instrument Co., 836 F.2d 1320, 1326 (Fed. Cir. 1987).  While the
applicable statute, 35 U.S.C. § 284, also provides that a damage
award shall not be "less than a reasonable royalty", "the purpose

of this alternative is not to provide a simple accounting method,
but to set a floor below which the courts are not authorized to
go." Id. (citing Seattle Box Co. v. Industrial Crating and
Packing, Inc., 756 F.2d 1574, 1581 (Fed. Cir. 1985)).

Ricoh sought to establish its damages under the standard
set forth in Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.,
575 F.2d 1152, 1156 (6th Cir. 1978), a permissible method by
which a patent owner may prove damages based on lost profits.
Under Panduit a patentee must show that but for the infringing
acts, the patentee would have made the sales and would have made
a certain level of profit. See Yarway Corp. v. Eur-Control USA,
Inc., 775 F.2d 268, 275 (Fed. Cir. 1985). Four elements must be
proved:

    (1)  A demand for the patented product,

    (2)  The absence of an acceptable, non-infringing
        substitute for the patented product,

    (3)  The patent owner's manufacturing and
        marketing capability to exploit the demand
        for the patented product, and

    (4)  The amount of profit the patent owner would
        have expected to make if the patent owner had
        made the infringer's sales.

See Radio Steel & Mfg. Co. v. MTD Prods., Inc., 788 F.2d 1554,
1555 (Fed. Cir. 1986) (citing Panduit, 575 F.2d at 1156).

To recover lost profits, then, Ricoh must prove by a preponderance that "but for" Nashua's infringement, it would have made the sales of infringing toner cartridges that were made by Nashua. Ricoh's evidence established that there was strong demand for its toner cartridges in the marketplace, that acceptable non-infringing substitutes were not then available, and that it had the manufacturing capacity and marketing ability to meet the demand. Accordingly, Ricoh has made the requisite showing that, but for Nashua's infringement, it would have made the sales made by Nashua.

Ricoh is, of course, not required to negate every possibility that some purchaser of Nashua's infringing products might not have bought Ricoh's product. See Paper Converting Machine Co. v. Magna-Graphics Corp., 745 F.2d 11, 21 (Fed. Cir. 1984). Ricoh need only provide proof to a reasonable probability that it would have made the sales Nashua made, but for the infringement. It has done so. See Rite-Hite Corp. v. Kelley Co., 56 F.3d 1538, 1545 (Fed. Cir. 1995) (en banc) (patent holder must show that the infringer actually caused the economic harm for which the patentee seeks compensation); W. L. Gore & Associates, Inc. v. Carlisle Corp, 198 U.S.P.Q. 353 (D. Del. 1978) (citing Broadview Chemical Corp. v. Loctite, 311 F. Supp.

4

447, 451 (D. Conn. 1970))(plaintiff under no obligation to negate all possibilities that the purchasers would not have bought a different product or to convince beyond a reasonable doubt); State Indust., Inc. v. Mor-Flo Indust., Inc., 883 F.2d 1573, 1577 (Fed. Cir. 1989).

The record proof establishes, and the court finds by a preponderance of the evidence, that the first three Panduit factors have been proven – there was an obvious demand for the patented product in the marketplace; there was an absence of acceptable, non-infringing substitutes for the patented toner cartridges; and Ricoh was positioned in the market with sufficient manufacturing and marketing capability to exploit the demand for the patented toner cartridges and "in all reasonable probability" would have made the infringing sales.

Nashua argues that Ricoh generally failed to meet its burden of proof with respect to damages because it failed to offer any analytical opinion testimony from a qualified expert accountant, and because its damages evidence was fatally incomplete in that it failed to show that all possible incremental costs have been taken into account in its lost profits calculation, including incremental costs that could have been substantial.  These

deficiencies, Nashua argues, serve to preclude determination of a "reasonably fair estimate" of Ricoh's lost profits damages by the requisite preponderance standard.

However, implicit throughout Nashua's legal memoranda on the subject is an apparent confusion between that proof necessary to establish a right to lost profits damages, and that proof necessary to establish the amount of damages properly recoverable.  The Supreme Court explained this distinction in Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555 (1931):

> The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong not to those damages which are definitely attributable to the wrong and only uncertain in respect to their amount
>
> * * *
>
> In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate.

Id., at 562.  This case is one in which damages in the nature of lost profits are definitely attributable to the wrongful infringement by Nashua, "and only uncertain in respect to their amount."  Id.

6

As is generally understood, then, a lost profits calculation in this context is necessarily a function of assumptions, approximations, and development or reconstruction of relevant data that may not be maintained in the ordinary course of business (such as targeted, product-specific financial data).  It is an exercise in hypothetical hindsight and, therefore, it should not be surprising if certified public accountants might express professional discomfort with any hard conclusions, and might well decline to certify either the accuracy of the underlying data or the rough conclusions to be derived from it.  After all, the assessment of approximate lost profits in this context probably involves less documented historical fact and more historical assumption and extrapolation than the accounting profession normally encounters.  That is no doubt why "[a] certified [accountant's] statement is not required" to prove lost profits damages in a patent infringement case, and why "[i]t is settled that mathematical exactitude in the ascertainment of damages cannot be expected and a reasonable approximation is all that is required once the wrong has been established." W.L. Gore & Assoc. Inc. v. Carlisle Corp., 198 U.S.P.Q. at 364 (quoting H.K. Porter Co., Inc. v. Goodyear Tire and Rubber Co., 183 U.S. P.Q. 794, 796 (N.D. Ohio 1974), aff'd, 536 F.2d 1115 (6th Cir. 1976)).

Nevertheless, in addition to proving causation — lost sales as a result of the infringement activity by the defendant — the patent holder still must prove the amount it probably lost. See Minco, Inc. v. Combustion Engineering, Inc., 95 F.3d 1109 (Fed. Cir. 1996). The proof cannot be speculative or represent mere guesswork, but it will be sufficient if it shows "the extent of the damages as a matter of just and reasonable inference, although the result be only approximate." W.L. Gore, 198 U.S.P.Q. at 363 (citing Story Parchment Co., 282 U.S. at 562)).

The amount, or quantum of damages, is an issue of fact for the trial court in the first instance, reviewable for clear error on appeal. See Mahurkar v. C.R. Bard, Inc., 79 F.3d 1572, 1579 (Fed. Cir. 1996) (citing Lam, Inc. v. Johns-Manville Corp., 718 F.2d 1056, 1065 (Fed. Cir. 1983)); Story Parchment Paper Co., 282 U.S. at 563.

While the amount of lost profits awarded cannot be speculative, the amount need not be proven with unerring precision. See Bio-Rad Labs, Inc. v. Nicholet Inst. Corp., 739 F.2d 604, 616 (Fed. Cir. 1984). The risk of uncertainty in calculating lost profits is placed squarely where it belongs - on

the infringer.  See Paper Converting Machine Company v. Magna-Graphics Corporation, 745 F.2d 11 (Fed Cir. 1984).  So, when the damages are not ascertainable with precision, reasonable doubt is appropriately resolved against the infringer.  See Lam, Inc., 718 F.2d at 1065; Kaufman Co. v. Lantech, Inc., 926 F.2d 1136, 1141 (Fed. Cir. 1991).  It is particularly appropriate to resolve doubts regarding the precision of the calculation against the infringer here, because Nashua had (but did not avail itself of) the opportunity to obtain pertinent discovery and attempt to demonstrate specific (presumably higher) incremental costs.

In any event, the court is "not restricted from choosing a figure other than that advocated by either party and may substitute an intermediate figure as a matter of judgment from all of the evidence." Minnesota Mining, 976 F.2d at 1579 (citing SmithKline Diagnostics, Inc. v. Helena Lab, Corp., 926 F.2d 1161, 1168 (Fed. Cir. 1991)).  Nashua's suggested lost profits figure is apparently zero, since it adheres to the view that Ricoh simply did not prove any lost profits by a preponderance of the evidence because so many possibilities could exist regarding hypothetical incremental costs. Of course, Nashua did not offer any evidence of its own as to what those incremental costs would likely have been if fairly quantified, and Nashua did have the

opportunity to either extrapolate from Ricoh financial data available through discovery, or to extrapolate from its own actual experience in producing and selling the offending products. (Nashua does argue, alternatively, for damages in the form of a small royalty as described by Dr. Friedlander - a calculation rife with its own problems).

Assessment of Damages

The basic damages issue in contention relates to whether or not additional incremental costs, of a substantial nature, should have been added to Ricoh's calculation of its hypothetical incremental costs of manufacturing and selling the infringing toner cartridges.  Mr. Blake was appointed to advise the court, first, whether the admitted financial evidence is adequate, from an accounting perspective, to support a reasonable and reliable determination of the incremental costs Ricoh would likely have incurred if it had produced the offending cartridges.  Next, the court sought opinion testimony from Mr. Blake as to whether, from an accounting perspective, there would likely have been additional indirect costs properly allocable to Ricoh's hypothetical production of the offending cartridges, that is, indirect allocable costs not accounted for by the evidence of record.  And if so, whether those additional unaccounted-for

10

incremental allocable costs would likely have been substantial or
de minimus, and whether it is possible to reasonably estimate
those costs.  Finally, the court asked Mr. Blake to opine as to
whether, from an accounting perspective, what those incremental
costs would likely have been.

   Mr. Blake thoroughly considered the matter, and brought his
professional expertise to bear.  Understandably, he was somewhat
uncomfortable with putting an accountant's imprimatur on the
documented accuracy of any assessment of lost profits in this
context.  Nevertheless, he but did make what seems a reasonable
estimate of his own – in the general neighborhood urged by
plaintiff.  Mr. Blake testified that there are no generally
accepted accounting principles ("GAAP") that directly and
exclusively relate to the calculation of hypothetical incremental
costs, but that general accounting concepts do lend themselves to
estimating facts necessary to roughly approximate lost profits.
Although Mr. Blake would have preferred access to far more data
-- to produce what he would consider a more reliable and
justifiable accountant's assessment -- that information was not
available to him (it was to defendant).  But the court does not
view Mr. Blake's discomfort or inability to produce a "better"
accountant's estimate, as precluding determination of a

reasonable approximation, or reasonably fair estimate, of the damages owed to the patent owner in this case under applicable legal standards.

And, while the court acknowledges that Mr. Blake opined that, based upon his own general accounting experience, it is highly unlikely that a company would operate at a 77.5 percent incremental profit margin, the court is unpersuaded that such a profit margin (an underline incremental profit margin, after all) is either inherently or facially unreasonable.  Mr. Blake gave no specific reasons as to why that margin might not be appropriate for the discrete production of toner cartridges within the plaintiff's general manufacturing operation, after fixed or sunk costs are removed.  And, it does not seem particularly worthwhile to compare that 77.5 percent claimed incremental profit figure with the plaintiff's Georgia plant average (overall) operating profit of 32.3 percent or its California plant's general operating profit.  That kind of quick comparison might well serve as a gross reality check in many situations, but the incremental profit margin (for N+1) for a discrete product like these toner cartridges, given plaintiff's ready capacity to produce and sell without major additions to labor forces or machinery or physical plant or marketing staff or management, should be expected to be

significantly higher than average product profit derived from
products that do carry those fixed expenses.

However, Mr. Blake usefully performed regression analyses on
major expense categories found in plaintiff's comparative income
statements.  He found that the costs listed in the Georgia and
California plants' income statements are related to sales volume
and, therefore, an increase should reasonably be considered when
fairly approximating incremental expenses.  With regard to Ricoh
Corporation, Mr. Blake found that selling costs tended to
increase in relation to increased product sales, and noted, at
page 16 of his report (admitted by agreement as direct
testimony), that Ricoh's incremental cost calculations "do not
include selling expenses of Ricoh Corporation or corporate
general and administrative expenses of Ricoh Company Limited."
The latter category, he concluded, would likely not have added to
Ricoh's incremental cost of producing the offending cartridges.

Considering all of the evidence of record, the court is
persuaded that plaintiff has produced sufficient evidence to meet
its burden of establishing a reasonably fair estimate of its lost
profits, though the court does find that plaintiff's own
assessment is somewhat on the high side of the range which is

supported by the evidence.  While plaintiff produced no expert
opinion testimony from a certified public accountant, it did
offer credible fact witnesses with detailed personal knowledge of
the major manufacturing, sales, and other costs associated with
production and marketing of its toner cartridges, as well as
other credible and relevant financial and operations data, from
which a reasonably fair estimate can be made.

As noted, the determination of a damage award in this
context is not an exact science.  See King Instrument Corp. v.
Otari Corp., 767 F.2d 853, 863 (Fed. Cir. 1985).  But the
obligation to make that determination is not diminished by its
difficulty.  See Del Mar Avionics, Inc. v. Quinton Instrument
Co., 836 F.2d at 1327.  Keeping in mind that determination of
actual lost profits is not possible, given the necessarily
hypothetical nature of the assessment, and that one could always
argue around the periphery about hypothetical incremental costs
that might, or might not have been incurred if plaintiff had
actually made and sold the infringing products, the court begins
its estimate by accepting as credible plaintiff's damages
evidence, as far as it goes.  (The number of infringing sales is
not seriously disputed, nor is Ricoh's sales price for its
patented products.)

Defendant makes a valid point in at least this sense - there probably would have been additional incremental costs associated with plaintiff's production and sale of the offending cartridges beyond what Ricoh has considered and adjusted for in its own estimate of lost profits.  The court appointed expert's testimony, and that of Mr. Hoffman (defendant's accounting expert), satisfies the court that the plaintiff's estimate of lost profits, while supportable, can be rendered more "reasonable" and "fair" by further adjusting for additional incremental costs that would likely have been incurred in connection with sales[1] and marketing, and, for some additional general manufacturing and overhead-type costs that probably would have been generated by the additional production and marketing as well. (While the additional cartridges would have represented only a modest 3% to 5% overall increase in toner cartridge production for Ricoh during the relevant period, that effort still would have had some incremental cost impact).

Mr. Blake, while understandably uncomfortable, from an accountant's perspective, in drawing firm conclusions about "what

---

[1]Plaintiff's suggestion that no incremental sales commissions or incremental selling, marketing, or overhead expenses at all would likely have been incurred in connection with its production and sale of the hypothetical cartridges is unrealistic.

might have been" absent a thorough forensic examination of all
pertinent Ricoh financial records, nevertheless has assisted the
court by essentially confirming the court's lingering concern
that Ricoh's lost profits calculation is wanting in this respect:
it is more likely than not that some amount of additional
incremental costs would probably have been incurred by Ricoh
beyond those it has taken into account.  We can never know with
certitude, of course, what those costs would actually have been,
but the court is satisfied that there would have been some and
that those costs would likely have been modestly significant.
Mr. Blake's own effort to quantify a reasonable lost profit
amount is also of use to the court, even though he candidly
stated that he did not have a great deal of confidence in the
number as a defensible, document-supported, accurate, or precise
accounting depiction.  But, then, that is not the legal standard
of proof required of Ricoh.  Mr. Blake's estimate is useful
because his informed approach considered and relied on the same
basic elements as did plaintiff, and his own reasonable fair
estimate of lost profits is generally in the same neighborhood as
plaintiff's, particularly when correcting for errors, thereby
validating the general integrity of the plaintiff's estimate from
an accountant's perspective.

Thus, the court is confident that substantial profits were lost, and those profits are reasonably quantified as plaintiff has done, albeit within a margin of error that can be fairly addressed by reducing the amount claimed to reflect approximated increased incremental costs. Accepting plaintiff's constructive criticisms of Mr. Blake's own effort to approximate lost profits virtually in toto (erroneous inclusion of machine depreciation expense as an incremental cost, etc.), as the court does, and not relying on Mr. Blake's own approximation of lost profits as substantive evidence of loss, the court nevertheless finds that a fairer approximation of actual damages in the nature of lost profits should take into account an additional incremental cost amount. Reducing plaintiff's own estimated lost profits calculation by 12% to reflect a reasonably prudent adjustment to achieve a fair approximation of those likely incremental costs, serves to resolve any lingering doubt in the court's view of what a "reasonably fair estimate" of lost profits proven by a preponderance of the evidence is in this case.

Ricoh's lost profits through December 3, 1995, unadjusted for additional incremental expenses, were approximately $8,578,383. The court finds, therefore, that a reasonably fair estimate of plaintiff's lost profits damages through December 3,

1995, is $7,548,977, and awards that amount.  In addition, the court awards damages for the period from December 4, 1995, through April 30, 1996, as calculated by Ricoh, but also reduced by an identical 12% for the same reasons, and further based on the actual number of infringing sales made by Nashua during the relevant time preceding the injunction (Nashua agreed to produce that available information promptly).[2]

Ricoh has not proved by clear and convincing evidence that Nashua's infringement was willful (see, e.g., Memorandum Decision, March 31, 1997, pp. 57 - 58) and no enhancement of damages is warranted.  Additionally, this is not an "exceptional case" warranting an award of attorney's fees and the court declines to make such an award.  Nashua relied on good faith legal advice in deciding that its competing products infringed neither the '730 nor the '603 patent.[3]

Plaintiff is awarded prejudgment interest at the average prime rate during the relevant periods of infringement, compounded quarterly (See footnote 2).  See General Motors Corp. v. Devex Corp., 461 U.S. 648, 657 (1983  )(prejudgment interest

---

[2]The parties ought to be able to agree on the calculation, but if necessary the court will entertain an appropriate motion to amend the judgment.

[3]The liability issues are currently pending review on appeal in the United States Court of Appeals for the Federal Circuit.

should be awarded absent some justification for withholding such

an award.)   Plaintiff is also awarded its costs and post-judgment

interest as allowed by statute.

      **SO ORDERED.**

                          _____
                          Steven J. McAuliffe
                          United States District Judge

September 30, 1998

cc:   Robert T. Greig, Esq.
      Lawrence B. Friedman, Esq.
      Stephen E. Weyl, Esq.
      Stephen B. Judlowe, Esq.
      Mark C. Rouvalis, Esq.