**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | |
|---|---|
| LIMELIGHT NETWORKS, INC., | Case No. 3:15cv720-JAG |
|     Plaintiff and Counterclaim Defendant, | |
|     v. | **JURY TRIAL DEMANDED** |
| XO COMMUNICATIONS, LLC., | |
|     Defendant, | |
| AKAMAI TECHNOLOGIES, INC., | |
|     Defendant and Counterclaim Plaintiff, | |
| MASSACHUSETTS INSTITUTE OF TECHNOLOGY, | |
|     Counterclaim Plaintiff. | |

<u>**LIMELIGHT NETWORKS, INC.'S REPLY REGARDING LIMELIGHT'S NOTICE OF
SUPPLEMENTAL AUTHORITY**</u>

Limelight submits this reply to briefly address the new arguments Akamai raised in its Response to Limelight's Notice of Supplemental Authority regarding the Federal Circuit's January 2018 decision in *Exmark Manufacturing Company, Inc. v. Briggs & Stratton Powers Products Group, LLC* ("Akamai's Response"). Akamai's Response does not challenge the key holding making *Exmark* relevant to this case: the *Exmark* decision unequivocally shows that Dr. Prowse was ***not required to apportion the royalty base*** in determining the appropriate reasonable royalty for Akamai's infringement of the 002 Patent. Instead, Akamai raises the new, false assertion that it had challenged Dr. Prowse's apportionment of the royalty *rate* all along and that *Exmark* shows that Dr. Prowse did not properly apportion the royalty *rate.* Akamai is wrong on both counts.

First, Akamai's *Daubert* challenge was limited to its assertion that Dr. Prowse was required to apportion the royalty base, and Akamai's apparent claim in its Response that it has challenged the apportionment of the royalty rate all along is simply false. Akamai's Opening *Daubert* Brief defines the scope of Akamai's *Daubert* challenge and the Court should hold Akamai to its own words: "Though his royalty rate is flawed in many respects, Dr. Prowse's opinion becomes legally unreliable when he then applies the 8% rate to all revenues for Akamai's accused Delivery and Web Acceleration products, instead of just the revenues allegedly resulting from the accused features." D.E. 233 at 8. In other words, while Akamai stated that it disagrees with Dr. Prowse, the only part of Dr. Prowse's opinion Akamai argued was subject to being struck under the *Daubert* standard, as opposed to merely a dispute for the jury, was the fact that he did not apportion the base. Accordingly, in its argument section, Akamai claimed only that Dr. Prowse was legally required to apportion the royalty *base*—captioning its argument "Dr. Prowse Does Not Apportion The Accused Royalty Base For The '002 Patent." D.E. 233 at 13. See also the remaining portions of Akamai's *Daubert* Opening Brief (D.E. 233 at 8-9, 13-18); Akamai's *Daubert* Reply Brief (D.E.

331) at 7-11; and Akamai's argument at the *Daubert* hearing, Dec. 20, 2016 Hrg. Tr. at 4:18-20

("The second problem is that Dr. Prowse violated the entire market value rule. He used the entire

revenues to determine his royalties for the '002 patent."); *see id*. at 12:4-7.  Akamai's *ex post facto*

argument regarding the 002 royalty rate stated for the first time in its brief following the *Daubert*

Evidentiary Hearing is not a properly raised *Daubert* challenge.  *Daubert* briefs were due in

November 2016 and set forth the scope of the parties' challenges to expert testimony, and Akamai

should not be allowed to make its *Daubert* challenges a moving target.

Second, to the extent the Court wishes to entertain Akamai's belated arguments regarding

the royalty rate, Akamai is also wrong in asserting that the *Exmark* decision shows why Dr.

Prowse's apportionment of the royalty rate is allegedly unreliable. On the contrary, Dr. Prowse's

careful and detailed analysis by which he apportioned the royalty rate to reflect only the

incremental benefit attributable to the claimed invention—and thus valuing the benefit of the

accused feature only to the accused products—stands in stark contrast to Exmark's expert's

analysis that was excluded.  Exmark's expert's analysis was plagued by a systemic, fundamental

problem—that is, she utterly failed to tie her analysis to the actual rate she picked:

> She merely addressed the Georgia-Pacific factors in light of the facts and then plucked
> the 5% royalty rate out of nowhere. It is not enough for an expert to simply assert that
> a particular royalty rate is reasonable in light of the evidence without tying the proposed
> rate to that evidence.

No. 2016-2197, 2018 U.S. App. LEXIS 783, at *37 (Fed. Cir. January 12, 2018).  *See also id*. at

*31-32 ("After a discussion of each of the *Georgia-Pacific* factors, including the benefits of the

patented technology, sales and profitability, and the competitive relationship of the parties,

Exmark's expert concluded with little explanation that Exmark and Briggs would have agreed to a

5% reasonable royalty rate on the sales of the accused lawn mowers as the value for the improved

baffle. No-where in her report, however, did she tie the relevant *Georgia-Pacific* factors to the 5%

2

royalty rate or explain how she calculated a 5% royalty rate using these factors.").

Dr. Prowse's analysis is on the opposite side of the spectrum from Exmark's expert's analysis.  Unlike Exmark's expert, Dr. Prowse details in his report, as he did at the evidentiary hearing in this Court, how he calculated the royalty rate for the 002 Patent. D.E. 276-1 (Prowse Initial Rep.), ¶¶ 328-336 and related exhibits; Jan. 10, 2017 Hrg. Tr. at 86:6-102:7; D.E. 276 (Limelight Opposition *Daubert* Br.) at 15-16.  Dr. Prowse correctly apportioned the value of the 002 patented invention by starting with input from Dr. Kevin Almeroth who identified a technologically comparable Cotendo patent application (which Akamai acquired among other intellectual property when it bought Cotendo) that was substantially similar to the 002 asserted claims, and using that comparable, Dr. Prowse calculated the apportioned royalty rate based on Akamai's own royalty calculation.[1] That is, Dr. Prowse used the 15% royalty rate, which Akamai's own trusted accountants determined as the royalty rate Akamai would avoid paying Cotendo for using Cotendo's technology claimed in Cotendo patent applications by virtue of its acquisition of Cotendo. D.E. 276-1 (Prowse Initial Rep.), ¶ 328; D.E. 276-2 (Prowse Reply Rep.), ¶ 132; *see also* D.E. 277-3 (Akamai 2012 Annual Report) at 66 (Akamai reporting the Cotendo analysis to the SEC and defining relief-from-royalty in its SEC filing as: "The relief-from-royalty method estimates the cost savings that accrue to the owner of an intangible asset that would otherwise be required to pay royalties or license fees on revenues earned through the use of the asset.").  Dr. Prowse's analysis is further license-based because he also reviewed the license agreements Akamai's accountants relied upon to confirm that their royalty rate calculation is supported with relevant evidence.   D.E. 276-1 (Prowse  Initial  Rep.), ¶ 329.   Further,  notably,  Akamai's

---

[1] Limelight's description of Dr. Prowse's analysis is not new.  Limelight merely repeats here the description from its *Daubert* Opposition Brief as backdrop to be able to respond to Akamai's mischaracterizations of Dr. Prowse's opinion in Akamai's Response.

accountants calculated the 15% royalty rate and then applied it to the total revenue of the end-products practicing Cotendo's technology. D.E. 276-2 (Prowse Reply Rep.), ¶ 132.  Dr. Prowse then performed a patent citation analysis to apportion that overall royalty rate to reflect only the rate attributable to the incremental benefit provided to Cotendo products based on comparable technology in its products.  To do this, Dr. Prowse determined the relative value (59%) of the one patent application that Dr. Kevin Almeroth determined is directly technologically comparable to the 002 Patent out of the combined value of several Cotendo patent applications Akamai acquired. D.E. 276-1 (Prowse Initial Rep.), ¶¶ 330-335.

Dr. Prowse also determined that the information he relied upon from the Cotendo acquisition is economically comparable. D.E. 276-1 (Prowse Initial Rep.), ¶¶ 328-335; D.E. 276-2 (Prowse Reply Rep.), ¶¶ 125-133.  Based on the relative value of Cotendo's (now Akamai's) comparable patent application, Dr. Prowse apportioned 8.9% out of the 15% royalty rate to the patent application comparable to the 002 Patent.  As he did with all his analyses in this case, he considered all the *Georgia-Pacific* factors, and conservatively concluded that a downward adjustment of the apportioned rate to 8.0% is appropriate to account for the incremental value of the 002 Patent as applied to Akamai's products in the hypothetical negotiation.  D.E. 276-1 (Prowse Initial Rep.), ¶ 336; *see also id.* ¶¶ 180-182, 192-193, 227-232, 301-309 (Dr. Prowse's 002 analysis for the other GP Factors).

Contrary to Akamai's Response, Dr. Prowse's analysis was a classic, legally sound comparability analysis that started from the point of technological comparability—namely, it was based on Dr. Almeroth's determination that a patent application for which royalty rate was quantifiable was indeed substantially similar to the asserted claims of the 002 Patent and thus is comparable in value to the actual accused cache hierarchy feature in the accused products and

4

therefore excludes value attributable to non-patented features.  Dr. Kevin Almeroth reviewed all

Cotendo patent applications Akamai acquired and determined that one of those patent applications

is technologically comparable to the asserted claims of the 002 Patent.  D.E. 276-5 (Initial Report

of Dr. Kevin Almeroth), ¶¶ 447-458.  Dr. Almeroth's analysis specifically compared the claims of

the Cotendo patent application to the 002 asserted claims.  The precedent in this district requires

only that Limelight can show that the Cotendo patent application is related to the actual 002

claimed invention. *See Intelligent Verification Sys., LLC v. Microsoft Corp.*, No. 2:12-cv-525,

2015 U.S. Dist. LEXIS 43042, at *11 (E.D. Va. Mar. 31, 2015).  Dr. Almeroth in fact exceeded

that requirement by finding a substantial similarity between the Cotendo patent application and the

002 asserted claims.  D.E. 276-5 (Initial Report of Dr. Kevin Almeroth), ¶¶ 447-458.  ***And Akamai***

***has not challenged Dr. Almeroth's analysis***.  Thus, Akamai's assertion in its Response that "there

was no showing that a royalty rate for Cotendo's ultimately worthless patent reflected the value of

the 'patented improvement' in the '002 patent, as compared to the 'conventional features' of the

claimed system, let alone Akamai's entire CDN," Akamai's Response at 3, reflects a fundamental

misunderstanding (or misrepresentation) of Dr. Prowse's analysis.  Dr. Almeroth identified a

patent application that is substantially similar to the 002 asserted claims and therefore ***by definition***

Dr. Prowse's determination of value was winnowed down to only assessing the value of the 002

claimed inventions and the corresponding accused feature, not any non-patented elements.  This

is exactly the kind of apportionment analysis that the law requires, and in *Exmark*, the Federal

Circuit confirmed that Dr. Prowse, having apportioned the rate, was not required to also apportion

the royalty base.

The Federal Circuit's new *Exmark* precedent directly and unequivocally rejects the only

actual basis of Akamai's *Daubert* motion regarding the reasonable royalty analysis for the 002

Patent. Akamai responds not with any legitimate legal argument but by trying to distract the Court

and substitute in an entirely new *Daubert* argument that fares no better than its first. *Exmark*

removes any doubt that it would be a legal error to grant Akamai's motion. When a Federal Circuit

holding states that the basis of a *Daubert* motion is legal error, the *Daubert* motion must be denied.

Limelight respectfully requests that the Court take account of this new Federal Circuit authority

and properly allow Dr. Prowse to testify about his reasonable royalty opinions for the 002 Patent.

Date: January 30, 2018

Respectfully submitted,

/s/  Natasha M. Saputo

Maya M. Eckstein (Va. Bar No. 41413)
HUNTON & WILLIAMS LLP
951 Byrd Street
Richmond, Virginia 23219
Telephone:    (804) 788-8788
Facsimile:     (804) 343-4630
Meckstein@hunton.com

Matthew D. Powers (CA Bar No. 104795)
(*pro hac vice*)
Paul T. Ehrlich (CA Bar No. 228543)
(*pro hac vice*)
Azra Hadzimehmedovic (CA Bar No. 239088)
(*pro hac vice*)
William P. Nelson (CA Bar No. 196091)
(*pro hac vice*)
Aaron M. Nathan (CA Bar. No. 251316)
(*pro hac vice*)
Robert L. Gerrity (CA Bar No. 268084)
(*pro hac vice*)
Natasha M. Saputo (VA Bar No. 80893)
Lital Leichtag-Fuks (CA Bar No. 295080)
(*pro hac vice*)
Yi Chen (CA Bar No. 295236)
(*pro hac vice*)
TENSEGRITY LAW GROUP, LLP
555 Twin Dolphin Drive, Suite 650
Redwood Shores, CA 94065

Telephone:      (650) 802-6000
Facsimile:      (650) 802-6001
matthew.powers@tensegritylawgroup.com
paul.ehrlich@tensegritylawgroup.com
azra@tensegritylawgroup.com
william.nelson@tensegritylawgroup.com
aaron.nathan@tensegritylawgroup.com
robert.gerrity@tensegritylawgroup.com
natasha.saputo@tensegritylawgroup.com
lital@tensegritylawgroup.com
yi.chen@tensegritylawgroup.com

*Attorneys for Plaintiff Limelight Networks, Inc.*

7

## CERTIFICATE OF SERVICE

I hereby certify that on the 30th day of January, 2018, a true copy of the foregoing will be electronically filed with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF).

/s/     *Natasha M. Saputo*
Natasha M. Saputo
